UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

METROPOLITAN LIFE INSURANCE
COMPANY,

      Plaintiff,

v.                    Case No:  2:20-cv-276-JES-MRM

FRED A. LIEBOWITZ,

      Defendant.

_____

## OPINION AND ORDER

This matter came before the Court on March 2 through 4, 2022, for a bench trial concerning two issues remaining after consideration of cross motions for summary judgment.  The Court heard testimony from Dr. Fred Liebowitz, Jamie Frederick, John Dieguez, William Whitney, Theresa Woods, and Ronald Graff.[1]  The Court also received a number of exhibits from both sides and heard closing arguments from counsel.  Both parties also filed post-trial memorandum and/or trial briefs.  (Docs. ## 118, 119, 120.)  As required by Fed. R. Civ. P. 52, the Court makes findings of fact and conclusions of law as set forth below.

I.

_____

[1] The testimony of Woods and Graff were submitted through deposition designations by the parties. (Pl. Ex. 131; Def. Ex. 48.) At the bench trial, Plaintiff objected to the admission of Graff's deposition testimony on relevance grounds.  Plaintiff's objection is overruled.

In its Complaint, plaintiff Metropolitan Life Insurance Company (MetLife) seeks court-ordered recission of defendant Dr. Fred Liebowitz's (Dr. Liebowitz) disability insurance policy (the Policy). Specifically, MetLife seeks a Court order "rescinding the Policy, and declaring that Liebowitz has no right, title, or interest in the Policy." (Doc. #1, Prayer for Relief.) In his Third Amended Counterclaim, Dr. Liebowitz asserts two interconnected counterclaims seeking reinstatement of the Policy and payment of benefits under the Policy. (Doc. #58.)

Discovery and trial in this matter were bifurcated. The first (current) phase will determine the insurance coverage issue, i.e., whether there is an enforceable Policy between Dr. Liebowitz and MetLife or whether MetLife can properly rescind the Policy. If coverage is established, the second phase is intended to address what, if any, benefits are due to Dr. Liebowitz under the Policy.

In a prior Opinion and Order (Doc. #103) resolving cross-motions for summary judgment, the Court denied Dr. Liebowitz's motion for summary judgment in its entirety. As to MetLife's motion, the Court granted partial summary judgment in favor of MetLife on the first, second, and fourth components of the fraud elements of MetLife's rescission claim. The Court also granted partial summary judgment in favor of MetLife on Dr. Liebowitz's First, Fourth, Fifth, Sixth, Seventh, and Eighth Affirmative Defenses. Additionally, pursuant to Fed. R. Civ. P. 56(g), the

Court found that the following material facts were not genuinely

in dispute and treated them as established for the coverage

determination in this case:

> 1.  Dr. Liebowitz made false statements
> concerning material facts when answering
> Questions 5(i) and 17 in the Application.
>
> 2. Dr. Liebowitz knew the representations he
> made when answering Questions 5(i) and 17 in
> the Application were false.
>
> 3.  MetLife was consequently injured when
> acting in reliance of Dr. Liebowitz's
> misrepresentations.
>
> 4. The Policy includes the provision set forth
> in Fla. Stat.§ 627.607(1).
>
> 5. Dr. Liebowitz was not assisted by a MetLife
> insurance agent when filling out the
> Application.
>
> 6. MetLife put Dr. Liebowitz on notice of its
> intent to rescind the Policy based on Dr.
> Liebowitz's alleged fraud.
>
> 7. MetLife relied on the statements made by
> Dr. Liebowitz in his Application in 2015 and
> did not investigate his answers until after
> Dr. Liebowitz filed his claim.

(Doc. #103, p. 33.)

The two primary remaining issues to be resolved in the bench

trial are whether MetLife established by a preponderance of the

evidence that: (1) Dr. Liebowitz made the false statements on the

insurance application with fraudulent intent, and (2) MetLife

rescinded the Policy within a reasonable period of time.  The Court

finds, for the reasons set forth below, that Dr. Liebowitz did

have such fraudulent intent and that MetLife did rescind the Policy within a reasonable period of time.

## II.

Much of the evidence presented at trial was repetitious of the evidence presented in connection with the summary judgment motions.  The parties previously submitted a "Statement of Undisputed Issues of Fact" in the Joint Pretrial Statement (Doc. #97, pp. 6-11).  It continues to be the case that "[b]oth parties contend that the facts are essentially undisputed . . ." (Doc. #97, p. 11), although the conclusions they draw from the facts vary greatly.  The Court finds the following facts have been proven by at least a preponderance of the evidence:

### A.   DOH Investigations and Complaints

For approximately 30 years Dr. Liebowitz has been a pain management physician, and at all relevant times ran a pain management clinic in the Fort Myers, Florida area. (Doc. #97, ¶ 9(1)).  Dr. Liebowitz's primary source of income was treating patients for pain and prescribing narcotics.  (Id. ¶ 9(3).)  Dr. Liebowitz is not board certified.

By a personally delivered letter dated May 10, 2010, the Florida Department of Health (DOH) notified Dr. Liebowitz that it was conducting a confidential investigation of a complaint filed against him in connection with the medical care he provided to different patients.  (Id. ¶ 9(10); Pl. Ex. 12.)  Dr. Liebowitz

notified his malpractice insurance carrier of the DOH investigation, and his carrier hired attorney William Whitney (Mr. Whitney) to represent Dr. Liebowitz. (Doc. #97, ¶ 9(12).) Around this same time, the DOH initiated two additional investigations against Dr. Liebowitz, relating to his care of approximately thirteen patients. (See Pl. Ex. 98D (describing cases).)

The DOH proceeded with the three confidential investigations until early 2013. Dr. Liebowitz testified that, from his point of view, the three investigations appeared largely dormant during these years, which he attributed to weakness of the cases.

Starting in January 2013,[2] after a panel of the DOH found probable cause, the DOH filed and served Dr. Liebowitz with three separate Administrative Complaints (the "DOH Complaints") alleging substandard medical care was provided to certain patients. (Doc. #97 ¶ 9(11); Pl Ex. 27.) The DOH Complaints alleged that on many occasions Dr. Liebowitz improperly prescribed pain killers to patients, including one incident where a patient subsequently died from drug overdose. The DOH Complaints requested that the Board

---

[2] The Court's Opinion and Order granting partial summary judgment (Doc. #103) stated "in 2010 and 2011" the Administrative Complaints were filed. As pointed out during the bench trial, this was incorrect. Dr. Liebowitz was served with confidential notices from the DOH that they were investigating his license in 2010 and 2011. (Pl. Ex. 12.) The official Administrative Complaints were filed and became available in public record in 2013 and 2014. This correction is not material to the Court's summary judgment Opinion and Order.

of Medicine impose penalties on Dr. Liebowitz, including revocation or suspension of his medical license, restrictions on his medical practice, fines, reprimands, probation, corrective action, and remedial education. On February 14, 2013, Dr. Liebowitz signed an Election of Rights form disputing the facts in the DOH Complaints and requesting a formal hearing. (Def. Ex. 39.) Dr. Liebowitz testified at trial, and has always maintained, that he did nothing improper and that the DOH would not be able to prove otherwise. Dr. Liebowitz testified that, based on the advice of counsel, he believed that nothing in the DOH allegations was of sufficient severity to warrant the loss of his medical license.

Throughout the DOH proceedings, from the confidential complaints to the DOH Complaints, Mr. Whitney kept Dr. Liebowitz apprised of significant developments. (Doc. #97, ¶ 9(13).) Dr. Liebowitz testified that he worked hard to defend himself against the DOH's allegations with counsel, painstakingly reviewing medical records and expert opinions, because he felt he had done nothing wrong. Dr. Liebowitz stayed current on matters related to the DOH Complaints because the proceedings were important to his medical practice and reputation. Dr. Liebowitz testified that both he and Mr. Whitney felt Dr. Liebowitz would be successful in his defense.

In July 2014, the DOH provided Dr. Liebowitz with a proposed settlement (the 2014 Settlement Agreement) (Pl. Ex. 35) for the

three pending DOH Complaints.   Dr. Liebowitz and Mr. Whitney discussed the proposal in detail.   Around this same time, Dr. Liebowitz was sent another notice from the DOH concerning a fourth, still-confidential investigation into his medical care of patients.[3]   In September 2014, Dr. Liebowitz hired a second attorney (Allan Grossman[4]) with his own funds to provide another review of his cases and to evaluate the 2014 Settlement Agreement. (Pl. Ex. 98D.)

The proposed 2014 Settlement Agreement contemplated resolution of Dr. Liebowitz's three pending DOH Complaints and did not consider the fourth investigation.   The 2014 Settlement Agreement included a reprimand against Dr. Liebowitz's medical license; a "death penalty" provision for Dr. Liebowitz's specialized practice, which, if accepted, would have prohibited Dr. Liebowitz from prescribing controlled substances; the imposition of a fine and costs; and other non-economic conditions. Dr. Liebowitz testified he never took this proposal seriously, and never accepted it.

Dr. Liebowitz did, however, on advice of counsel, take steps in late 2014 to enhance his settlement negotiation position.   Dr.

_____

[3] This would ultimately become an official, public DOH Complaint in late 2015.

[4] Mr. Grossman is the former general counsel of the Florida Board of Medicine.

Liebowitz: (1) hired a risk management consultant to evaluate his medical practice (Pl. Ex. 98E); (2) took various continuing medical education courses related to his specialty; and (3) went to Colorado for a physician's assessment (Pl. Ex. 98F). Dr. Liebowitz paid for these services out-of-pocket.

### B.   MetLife Insurance Application and Policy Issuance

For the prior 10-15 years, Dr. Liebowitz's regular insurance agent was Mark Vertich (Mr. Vertich), an independent insurance broker. Sometime in mid- to late-2014, Dr. Liebowitz spoke with Mr. Vertich about obtaining disability insurance. Dr. Liebowitz testified that, several years before speaking with Mr. Vertich about disability insurance, he had a disability policy with another insurer for 10-15 years but had let the policy lapse for several years before seeking the MetLife policy. Dr. Liebowitz decided that, considering his current family situation, he had made a mistake in letting the policy lapse. It is unclear why Dr. Liebowitz or Mr. Vertich chose to pursue a MetLife policy, since at the time Mr. Vertich was not an authorized broker for MetLife.

In any event, on January 30, 2015, Dr. Liebowitz and Mr. Vertich sat at a kitchen table at Dr. Liebowitz's office to fill out MetLife's 11-page application (the "Application") (Pl. Ex. 3) and 2-page Health Questionnaire Supplement (Pl. Ex. 6) for disability insurance. Mr. Vertich read Dr. Liebowitz the questions on the Application and Supplement, Dr. Liebowitz dictated his

responses to Mr. Vertich, Mr. Vertich transcribed the information, and Dr. Liebowitz signed the document.  There were no instructions provided with the Application and Mr. Vertich did not provide any instruction to Dr. Liebowitz.  Dr. Liebowitz assumed MetLife wanted an applicant to be truthful and honest and to fill out everything to the best of their knowledge.  Indeed, the Application provides that all answers are "to the best of [his] knowledge and belief." (Pl. Ex. 3, p. 6.)  Dr. Liebowitz testified that the information in the Application was transcribed correctly by Mr. Vertich.  The total process to complete the Application took 10-15 minutes.

The Application included the following two relevant questions and answers:

> Question 5(i): Are you aware of any fact that could change your occupational status or financial stability? If YES, please give details below.
>
> Answer: No [box checked].
>
> ***
>
> Question 17: Have you EVER had a professional license suspended, revoked, or is such license under review or have you ever been disbarred? If YES, give details below.
>
> Answer: No [box checked].

(Id. pp. 1, 5.)  Dr. Liebowitz maintains to this day that these answers were truthful.  Prior to issuing the Policy, MetLife made no investigation to determine the accuracy of Dr. Liebowitz's

answers to the two questions in the Application, relying solely on his answers.  (Doc. #97, ¶ 9(8).)

MetLife processed Dr. Liebowitz's Application and issued the Policy between April 16 and May 3, 2015.  (Doc. #97, ¶ 9(4); Pl. Ex. 1.)  The Policy was backdated to March 6, 2015 to preserve Dr. Liebowitz's age (54 years old at the time of his Application). (Pl. Ex. 1, p. 3.)  Between May 3 and 4, 2015, the Policy was delivered to Dr. Liebowitz, who signed an Amendment to the Application which affirmed that "there [were] no facts or circumstances which would require a change in the answers in the application" and that "[t]o the best of my knowledge and belief, the statements and answers in the application as amended by this form are true and complete as of the date this form is signed." (Pl. Ex. 9.)

The Policy itself is an occupational disability insurance policy. (Pl. Ex. 1.)  MetLife issues this type of insurance policy to high-wage earners, such as lawyers and doctors, like Dr. Liebowitz.  Occupational disability insurance policies are designed to protect a wage-earner's income should the insured be unable to work because of a disability.  The Policy provides for both total disability and residual disability benefits.  (Id. p. 3.)  If Dr. Liebowitz was ever found to be totally disabled under the Policy, he would receive $16,550 per month in benefits.

C.    **Resolution of the DOH Complaints**

Returning to Dr. Liebowitz's DOH proceedings, the intensity of the proceedings seemed to ebb and flow over the years, sometimes with greater interest and activity than at other times.  By March 2016, although Dr. Liebowitz continued to maintain his innocence, Dr. Liebowitz advised Mr. Whitney of his willingness to negotiate a settlement.  (Pl. Ex. 99.)  However, there is nothing to indicate Dr. Liebowitz and the DOH talked settlement in 2016 and Mr. Whitney testified that the proposed 2014 Settlement Agreement remained on the table.  By 2017 Dr. Liebowitz felt that a perceived opioid epidemic caused the narcotics prescription practices of physicians to receive closer scrutiny.  But the DOH proceedings remained relatively quiet.  Finally, in December 2017 the Sun-Sentinel described Dr. Liebowitz's DOH Complaints in an on-line article titled "Dangerous doctors, Pain pill docs keep prescribing despite state charges."  (Pl. Ex. 40.)  This publication and other pressures about the length of Dr. Liebowitz's DOH proceedings appeared to create renewed interest in the DOH prosecuting Dr. Liebowitz's cases.

By 2018, the DOH amended the DOH Complaints, reduced the scope of the allegations (Pl. Ex. 115B) to 16 counts, and told Mr. Whitney they were willing to administratively try those counts. As this new prosecution progressed, Mr. Whitney's evaluation of the cases began to change, recognizing that it would be difficult

for Dr. Liebowitz to be successful on all 16 counts.  (Pl. Ex. 45.)  Dr. Liebowitz became focused on the three-strike rule, under which his medical license could be threatened if the administrative judge found three violations of the standard of care.  Also, Dr. Liebowitz's defense funds available through his malpractice insurer were beginning to run low, and the anticipated costs of defending himself were significant.  By August 2018 these circumstances caused Dr. Liebowitz and his attorney to engage in extensive discussions regarding settlement.  (Id.)

On September 11, 2018, pursuant to the advice of counsel, Dr. Liebowitz entered into a settlement agreement (the 2018 Settlement Agreement) with the DOH.  (Doc. #97, ¶ 9(15); Pl. Ex. 60.)  The Board of Medicine approved the 2018 Settlement Agreement at a hearing on December 7, 2018 and issued a Final Order approving the 2018 Settlement Agreement on December 18, 2018.  The Clerk of the Department of Health docketed the Final Order on December 20, 2018. (Pl. Ex. 60.)  Among other things, the Final Order issued a reprimand against Dr. Liebowitz's medical license, restricted his DEA license and his ability to prescribe any controlled substance until he complied with certain requirements, imposed a fine and costs, and imposed other non-economic conditions.  (Id.)  Despite the settlement, Dr. Liebowitz testified at trial that to this day he feels he did everything properly and within the required standard of care.

D.   **Dr. Liebowitz's Insurance Claim**

In September 2018, when Dr. Liebowitz was filling out the health section of a life insurance policy application with Mr. Vertich, he discussed difficulties with his left ankle arising from October-November 2014.[5]  Mr. Vertich reminded Dr. Liebowitz of his Policy with MetLife, but Dr. Liebowitz did not perceive himself as disabled at the time and was uncertain whether he wanted to file a claim.  Nonetheless, on September 17, 2018, Mr. Vertich called MetLife about a disability claim to be filed by Dr. Liebowitz.  (Pl. Ex. 48.)

The next day, MetLife sent Dr. Liebowitz a letter enclosing an initial claim form.  (Pl. Ex. 49.)  On October 22, 2018, Theresa Woods,[6] a MetLife claims adjuster, spoke with Mr. Vertich on the phone about the potential claim by Dr. Liebowitz.  (Pl. Ex. 54.)  On November 15, 2018, not having heard from Dr. Liebowitz or Mr. Vertich, Ms. Woods followed-up with Dr. Liebowitz regarding his potential claim.  (Pl. Ex. 55.)  On that same day, Ms. Woods placed the Sun-Sentinel article into Dr. Liebowitz's claim file.  (Pl.

---

[5] Dr. Liebowitz testified at trial that he began experiencing ankle pain in late 2014.  In his claim form, Dr. Liebowitz wrote that he began experiencing ankle pain in late 2015 and his disabling condition began in January 2016.  (Pl. Ex. 61.)  In his counterclaim, Dr. Liebowitz states his disabling condition from ankle pain began in July 2017.  (Doc. #58, ¶ 38.)

[6] In certain documents submitted as evidence, Theresa Woods is seen by her maiden name, Theresa First.  The Court will consistently use Theresa Woods.

Ex. 40.)   On November 29, 2018, Ms. Woods placed a DOH license
verification printout from the DOH website into the claim file.
(Pl. Ex. 57.)   On December 14, 2018, after not receiving a claim
form, Ms. Woods again reached out to Dr. Liebowitz concerning his
potential claim.   (Pl. Ex. 58.)

On December 18, 2018, Dr. Liebowitz submitted his initial
claim form for residual disability benefits to MetLife.   (Pl. Ex.
61.)   In the form, Dr. Liebowitz indicated that his disabling
condition (ankle injury) which entitled him to residual disability
benefits began on January 4, 2016.   Dr. Liebowitz attached a
detailed handwritten statement to the claim form which indicated
he wanted have ankle surgery in early 2019 and secure a temporary
physician (locum tenens) to help cover his practice while he was
off his feet.   (Id.)   Dr. Liebowitz did not disclose in his claim
form that he also intended to hire a temporary physician to
prescribe pain medication in early 2019 because of the restrictions
on his DEA license from the 2018 Settlement Agreement.   Dr.
Liebowitz testified that he hoped to get ankle surgery done in
early 2019[7] because he already knew he would have coverage for his
practice due to the DEA restrictions.

E.    **MetLife's Claim Processing and Rescission**

---

[7] Dr. Liebowitz ultimately had successful ankle surgery in
April 2021.

Ms. Woods then began formally processing Dr. Liebowitz's claim. The evidence showed the following timeline:

| Date | Occurrence |
|------|-----------|
| December 18, 2018 | Dr. Liebowitz submitted his initial claim form. (Pl. Ex. 61.) |
| December 28, 2018 | Ms. Woods printed, and included in the claim file, two documents from Dr. Liebowitz's DOH public profile which showed information about the DOH Complaints and 2018 Settlement Agreement. (Pl. Ex. 62; Def. Ex. 20.) |
| January 9, 2019 | Ms. Woods sent Dr. Liebowitz a status letter that described the Policy, requested certain financial and medical records from him, and explained that his almost three-year delay in filing the claim may necessitate more time to evaluate the claim. (Def. Ex. 21.) |
| February 8, 2019 | Ms. Woods sent Dr. Liebowitz another status letter requesting additional information and informing Dr. Liebowitz that a field representative would be meeting with him. (Def. Ex. 22.) |
| March 8, 2019 | Ms. Woods sent a status letter to Dr. Liebowitz. (Def. Ex. 23.)[8] |
| May 3, 2019 | Ms. Woods sent a status letter to Dr. Liebowitz. (Def. Ex. 24.)[9] |
| Late May to early June 2019 | Ms. Woods went on maternity leave and Jamie Frederick was assigned to Dr. Liebowitz's claim. Mr. Frederick begins to focus on the DOH medical license issue. |

---

[8] In the various status letters, Ms. Woods described the medical, financial, and occupational records she was collecting, or still needed from Dr. Liebowitz, to process his claim. None of the status letters from Ms. Woods sought information from Dr. Liebowitz about the DOH Complaints.

[9] See fn. 8.

| June 7, 2019 | Mr. Frederick spoke to Dr. Liebowitz on the phone, provided a status update, and inquired about the DOH proceedings.  (Pl. Ex. 71.) |
| --- | --- |
| June 8, 2019 | Mr. Frederick sent a follow-up status letter to Dr. Liebowitz and requested additional information about the DOH Complaints.  (Def. Ex. 25.) |
| July 19, 2019 | Mr. Frederick met with in-house counsel to discuss the DOH Complaints and possible impact on Dr. Liebowitz's claim adjudication. |
| August 8, 2019 | Mr. Frederick sent another status letter to Dr. Liebowitz.  (Def. Ex. 28.) |
| August 8, 2019 | Mr. Frederick requested information from the DOH about Dr. Liebowitz's DOH proceedings since 2014.  (Pl. Ex. 73.)  The DOH quickly responded.  (Pl. Ex. 74.) |
| Early August 2019 | Mr. Frederick sent a referral to MetLife's underwriting department to determine whether there were issues with the Application based on the information in MetLife's possession. |
| August 20, 2019 | Linda Castonguay executed a Referral to Underwriter, which described the possible material misrepresentations in the Application.  (Pl. Ex. 77.)  Ms. Castonguay pointed out issues with Dr. Liebowitz's medical disclosures.  (Id.)  Ms. Castonguay also stated that, had MetLife known of the DOH Complaints and medical licensing issues, MetLife would not have issued the Policy. (Id.)  Ms. Castonguay only mentioned Question 17, not Question 5(i), in support of her finding. |
| October 10, 2019 | Without any response from Dr. Liebowitz to the June 8th or August 8th letters, Mr. Frederick sent Dr. Liebowitz a letter (Def. Ex. 29) describing MetLife's concern with answers to Application Questions 5(i) and 17 because Dr. Liebowitz did not disclose the DOH proceedings and requested an explanation for the failure to disclose.  (Id.) |

16

| | |
|---|---|
| October 24, 2019 | Dr. Liebowitz responded, through counsel, and asserted his belief that he did not need to disclose the DOH proceedings on the Application because:<br><br>1. It was his understanding and belief and remains the same that [he] did not [sic] believe in good faith that any proceedings would have changed his occupational status or financial stability and, in fact, the administrative proceeding ended without any admission of wrongdoing on Dr. Liebowitz's part whatsoever; and<br><br>2. His license was neither suspended nor revoked nor was he ever "disbarred" as a result of any proceeding.<br><br>(Pl. Ex. 79.) |
| October 29, 2019 | Mr. Frederick requested additional information from counsel about the possible medical misrepresentations in the Application. (Pl. Ex. 79A.) |
| December 2, 2019 | After receiving an extension of time (Pl. Exs. 79B, 79C, 80), Dr. Liebowitz's counsel responded (Pl. Ex 79D). |
| December 3, 2019 | Mr. Frederick sent Dr. Liebowitz's counsel a letter, confirming receipt of his prior correspondence and stating that MetLife was reviewing all information. (Pl. Ex. 79E.) |
| December 18, 2019 | Interested MetLife personnel met to discuss Dr. Liebowitz's file and Application. MetLife ultimately decided to rescind the Policy. (Pl. Ex. 81.) |
| December 30, 2019 | MetLife sent Dr. Liebowitz, through counsel, a formal Notice of Rescission, which included a check representing all premiums paid plus interest. (Pl. Exs. 82, 83.) |

17

|  |  |
|--|--|

# III.

Generally, to succeed on a claim for rescission a plaintiff must prove the following six elements by a preponderance of the evidence:

> (1) [t]he character or relationship of the parties; (2) [t]he making of the contract; (3) [t]he existence of fraud, mutual mistake, false representations, impossibility of performance, or other ground for rescission or cancellation; (4) [t]hat the party seeking rescission has rescinded the contract and notified the other party to the contract of such rescission; (5) [i]f the moving party has received benefits from the contract, he should further allege an offer to restore these benefits to the party furnishing them, if restoration is possible; [and] (6) [l]astly, that the moving party has no adequate remedy at law.

Billian v. Mobil Corp., 710 So.2d 984, 991 (Fla. 4th DCA 1998).

## A.    Undisputed Elements of Rescission Claim

The existence of four of the six elements is not disputed by the parties.  The "first requirement of a suit for rescission under Florida law" is that the "parties to the lawsuit lie in contractual privity."  Thompkins v. Lil' Joe Records, Inc., 476 F.3d 1294, 1315 (11th Cir. 2007) (citation omitted).  The second element of a rescission claim requires proof that a contract was made between the parties.  Billian, 710 So.2d at 991.  It is undisputed that there was a contract (i.e., the insurance Policy) between MetLife

and Dr. Liebowitz.  The Court concludes that MetLife has established the first and second elements of its rescission claim.

The fifth element of a rescission claim requires MetLife to prove that it offered to restore any benefits received from Dr. Liebowitz under the Policy.  <u>Billian</u>, 710 So.2d at 991.  On December 30, 2019, MetLife sent Dr. Liebowitz a check representing all premiums previously paid on the Policy plus interest.  (Pl. Exs. 82, 83.)  The Court concludes that MetLife has established the fifth element of its rescission claim.

The sixth element of a rescission claim requires MetLife to show that there are no adequate remedies at law.  <u>Billian</u>, 710 So.2d at 991.  <u>See also</u> <u>Rost Invs., LLC v. Cameron</u>, 302 So. 3d 445, 450 (Fla. 2d DCA App. 2020), <u>review denied</u>, No. SC20-1495, 2021 WL 1402224 (Fla. Apr. 14, 2021) ("Rescission is an equitable remedy which is only available if the [plaintiffs] have no remedy at law." ); <u>Collier v. Boney</u>, 525 So. 2d 971, 972 (Fla. 1st DCA 1988) ("[A] fundamental requirement necessary for rescission of a contract is that the moving party has no adequate remedy at law.").  MetLife has no legal remedy, and its only remedy to preclude Dr. Liebowitz from seeking benefits under the Policy is to rescind the Policy.  The Court concludes that MetLife has established the sixth element of its rescission claim.

**B.   Disputed Elements of Rescission Claim**

The third and fourth elements of the rescission claim are strenuously contested by the parties and were the two remaining issues after the Court's Order on summary judgment: (1) MetLife's grounds for rescission, i.e., Dr. Liebowitz's intent; and (2) MetLife's actual rescission, i.e., whether MetLife rescinded the policy within a reasonable time period. The Court addresses each in turn.

**(1) Misrepresentations on Insurance Application**

The third element of a recission claim requires a plaintiff to establish a ground for recession, such as the existence of fraud or false representations. Billian, 710 So.2d at 991. In the context of the rescission of an insurance policy, "Florida law ... gives an insurer the unilateral right to rescind its insurance policy on the basis of misrepresentation in the application of insurance." Moustafa v. Omega Ins. Co., 201 So. 3d 710, 714 (Fla. 4th DCA 2016) (citation omitted).

Rescission of an insurance policy because of a misstatement in the application is governed by Fla. Stat. § 627.409(1), which provides in relevant part:

> (1) Any statement or description made by or on behalf of an insured or annuitant in an application for an insurance policy or annuity contract, or in negotiations for a policy or contract, is a representation and not a warranty. Except as provided in subsection (3), a misrepresentation, omission, concealment of fact, or incorrect statement

> may prevent recovery under the contract or
> policy only if any of the following apply:
>
> (a) The misrepresentation, omission,
> concealment, or statement is fraudulent or is
> material to the acceptance of the risk or to
> the hazard assumed by the insurer.
>
> (b) If the true facts had been known to the
> insurer pursuant to a policy requirement or
> other requirement, the insurer in good faith
> would not have issued the policy or contract,
> would not have issued it at the same premium
> rate, would not have issued a policy or
> contract in as large an amount, or would not
> have provided coverage with respect to the
> hazard resulting in the loss.

Under this statute, "misrepresentations, omissions, concealment of facts, and incorrect statements on an insurance application will not prevent a recovery under the policy unless they are either: (1) fraudulent; (2) material to the risk being assumed; or (3) the insurer in good faith either would not have issued the policy or would have done so only on different terms had the insurer known the true facts." Certain Underwriters at Lloyd's London v. Jimenez, 197 So. 3d 597, 601 (Fla. 3d DCA 2016). Even an unintentional misstatement can constitute grounds for rescission under the statute if the other statutory elements are satisfied. Hauser v. Life Gen. Sec. Ins. Co., 56 F.3d 1330, 1334 (11th Cir. 1995), as amended on denial of reh'g (Sept. 15, 1995).

In this case, however, the statutory basis for rescission is further restricted by two provisions in the Policy. First, the Policy contains a "Time Limit on Certain Defenses" provision, which

provides: "After 2 years from the issue date, only fraudulent misstatements in the application may be used to void the policy or deny any claim for loss incurred or disability starting after the 2-year period."  (Doc. #103, p. 27.)[10]  Because of the "Time Limit on Certain Defenses" provision, MetLife may only rescind the Policy based on fraudulent misstatements.  Fla. Stat. § 627.409(1)(a); § 627.607(1).   Under Florida law, "there are four elements of fraudulent misrepresentation: (1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation."  Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010) (quotation omitted).  Following the Court's Order on summary judgment, only the third element remains. (Doc. #103.)

Second, the language used in the Application required Dr. Liebowitz to affirm that his statements were true "to the best of his knowledge and belief."  "Where the language an insurance company chooses in its insurance application shifts the focus from a determination of truth or falsity of an applicant's statements

---

[10] The original Policy language did not strictly conform with Fla. Stat. § 627.607(1).  (See Pl. Ex. 1, p. 15.)  As detailed in the Court's summary judgment order, the Court deemed the Policy to include the two-year provision of Fla. Stat. § 627.607(1).  (Doc. #103, pp. 24-27.)

to an inquiry into whether the applicant believed the statements to be true, the applicant's answers must be assessed in light of his actual knowledge or belief." Hauser, 56 F.3d at 1334-35. The Eleventh Circuit has approved the following test for examining responses to questions asked according to the applicant's knowledge and belief:

> The twin qualifiers knowledge and belief] require that knowledge not defy belief. What the applicant in fact believed to be true is the determining factor in judging the truth or falsity of his answer, but only so far as that belief is not clearly contradicted by the factual knowledge on which it is based. In any event, a court may properly find a statement false as a matter of law, however sincerely it may be believed. To conclude otherwise would be to place insurance companies at the mercy of those capable of the most invincible self-deception—persons who having witnessed the Apollo landing still believe the moon is made of cheese.

Hauser, 56 F.3d at 1335 (cleaned up); see also Miguel v. Metro. Life Ins. Co., 200 Fed. App'x. 961, 966 (11th Cir. 2006) (citations omitted).

So, considering the foregoing law, the Court asks two questions: (1) Did Dr. Liebowitz intend that MetLife rely on his false statements in the Application?  And, (2) Did Dr. Liebowitz fail to fill out the Application "to the best of his knowledge and belief?"  Because the Court answers both questions "yes," the Court finds that MetLife had grounds to rescind the Policy.

For the first question, the Court already found, and continues to find, that Dr. Liebowitz knowingly made false statements in the Application. (Doc. #103, p. 16.) Dr. Liebowitz filled out the Application with the intent to receive disability insurance coverage from MetLife. An insurer, like MetLife, is entitled to rely on the statements in the Application. Nembhard v. Universal Prop. & Cas. Ins. Co., No. 3D20-1383, 2021 WL 3640525, at *3 (Fla. 3d DCA Aug. 18, 2021) (citations omitted) ("An insurance company has the right to rely on an applicant's representations in an application for insurance and is under no duty to inquire further, unless it has actual or constructive knowledge that such representations are incorrect or untrue."). By seeking the insurance policy and knowingly making false statements on the Application, Dr. Liebowitz intended for MetLife to rely on his false statements to obtain the Policy from MetLife. See Philip Morris USA Inc. v. Principe, 3D20-875, 2021 WL 4302370, at *6 (Fla. 3d DCA Sept. 22, 2021) (citation omitted) (""A false statement in the abstract, even if knowingly made, does not constitute fraud; indeed, what makes a false statement fraudulent is the declarant's intent that others rely upon it."). The Court finds that MetLife has proven that Dr. Liebowitz acted with fraudulent intent when he completed the Application.

For the second question, despite Dr. Liebowitz's stated belief that he answered Questions 5(i) and 17 on the Application

correctly, the circumstantial evidence establishes the contrary. In 2014, Dr. Liebowitz sought out the MetLife policy with Mr. Vertich's assistance, having let a prior disability insurance policy lapse for several years. Despite the lack of instructions with the application form, Dr. Liebowitz testified that he understood the key relevant requirement – that he answer the questions honestly to the best of his knowledge and belief. Dr. Liebowitz clearly knew the two questions at issue were relevant and material, since he was applying for an occupational disability policy. In January 2015, when Dr. Liebowitz filled out the Application with Mr. Vertich's assistance, Dr. Liebowitz's DOH proceedings were active: (1) the 2014 Settlement Agreement was pending and included a serious "death penalty" provision; (2) two attorneys (one being paid out-of-pocket) were reviewing his cases and the 2014 Settlement Agreement; and (3) Dr. Liebowitz was taking active (and expensive) steps to try and improve his negotiation position with the DOH, including flying to Colorado for a physician's assessment in late December 2014. Dr. Liebowitz's stated belief is clearly contradicted by his actual knowledge at the time he filled out the Application.

At trial, Dr. Liebowitz tried to explain his reasoning behind this belief in part because he did not think he needed to disclose the DOH proceedings since he was applying for disability insurance and the DOH proceedings were separate issues. In Dr. Liebowitz's

view, the Policy only concerned coverage if he became disabled due to health issues or an accident, and the Policy had nothing to do with his job or losing his license.  The Court does not find Dr. Liebowitz's explanation accurate or credible.  Dr. Liebowitz was applying for an occupational disability insurance policy, which would provide him at most $16,550 per month if he were unable to work because of a total disability.  Dr. Liebowitz's occupational information was important to him receiving coverage from MetLife, including the amount of coverage from MetLife.  That is why MetLife asked him questions about his "occupational status" and professional license.  Dr. Liebowitz did not fill out the Application "to the best of his knowledge and belief."  Had he done so, he would have disclosed the DOH proceedings.

Similarly, the Court does not find Dr. Liebowitz's other explanations for why he believed he was not required to disclose the DOH proceedings to be credible in light of the factual events which were well known to him.  While the case is not as tenuous as the moon-made-out-of-cheese example in Hauser, 56 F.3d at 1335, Dr. Liebowitz's stubborn refusal to acknowledge the fact of an ongoing investigation which could jeopardize his medical license and his financial stability cannot justify his answers.  The Court finds that when Dr. Liebowitz answered "no" to the two questions, he did not answer either to the "best of his knowledge and belief." Indeed, that Court is satisfied that Dr. Liebowitz did in fact

believe that the DOH proceedings were a review of his medical license, that he could lose his medical license either temporarily or permanently, and either such loss would have serious financial repercussions.

Thus, the Court finds that MetLife has carried its burden of proving intent by a preponderance of the evidence and that MetLife has proven all elements of fraudulent misrepresentation.  The Court also finds that Dr. Liebowitz did not fill out the Application to the best of his knowledge or belief.  The Court concludes that MetLife has establish that it had grounds to rescind the Policy, the third element of its rescission claim.

Additionally, because MetLife established intent, MetLife is entitled to judgment on the Second and Third Affirmative Defenses, the only two defenses which remained following the Court's Order on summary judgment (Doc. #103), to the extent those defenses asserted that MetLife could not rescind the Policy based on Dr. Liebowitz's intent.

### (2) Rescission and Notice of Rescission

The fourth element of a rescission claim requires MetLife to prove that it rescinded the Policy and notified Dr. Liebowitz of the rescission within a reasonable period of time.  Billian, 710 So.2d at 991.  "An insurer that delays informing its insureds of a dispute about coverage may find itself estopped from contesting coverage if the insureds show prejudice resulting from the delay."

Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Sahlen, 999 F.2d 1532, 1537 (11th Cir. 1993).

> [W]hen an insurer has knowledge of the existence of facts justifying a forfeiture of the policy, any unequivocal act which recognizes the continued existence of the policy or which is wholly inconsistent with a forfeiture, will constitute a waiver thereof. While, ordinarily, the insurer is not deemed to have waived its rights unless it is shown that it has acted with the full knowledge of the facts, the intention to waive such rights may be inferred from a deliberate disregard of information sufficient to excite attention and call for inquiry as to the existence of facts by reason of which a forfeiture could be declared.

Johnson v. Life Ins. Co. of Ga., 52 So. 2d 813, 815 (Fla. 1951). An insurer, however, may take a reasonable amount of time to investigate the facts justifying rescission. "An insurer is not deemed to have waived its right to contest the validity of an insurance policy by the acceptance of a premium unless it is shown that it has acted with full knowledge of the facts. Likewise, estoppel can only be invoked against an insurer when its conduct has been such as to induce action in reliance upon it." Mut. of Omaha Ins. Co. v. Eakins, 337 So. 2d 418, 419 (Fla. 2d DCA 1976)(citations omitted.)

The timeline from the start of MetLife's claim processing to the final decision to rescind the Policy demonstrates that MetLife took reasonable time to investigate Dr. Liebowitz's disability claim and his Application before seeking rescission.  On December

28, 2018, shortly after receiving Dr. Liebowitz's claim form, Ms. Woods printed off information about the DOH Complaints and the restriction on Dr. Liebowitz's medical license. The evidence does not show that Ms. Woods deliberately disregarded this information, but was focused elsewhere. Ms. Woods was actively trying to gather a plethora of information about Dr. Liebowitz's residual disability claim which asserted that his work had been impacted due to an ankle injury since January 4, 2016.[11] Ms. Woods was not looking for possible fraud on the Application. Ms. Woods testified that she did not even remember the Application questions while processing the claim.

MetLife was also not required to rely solely on the printouts from the DOH website to determine that there may have been concerns with the Application. Mr. Frederick, who took over Dr. Liebowitz's file after Ms. Woods left on maternity leave, testified that he did not understand the information shown on the printouts or the DOH website.[12] Notably, once MetLife started actively investigating Dr. Liebowitz's medical license and requested more

---

[11] Dr. Liebowitz's now contends that his disabling condition occurred in July 2017. However, at the time he filled out the Application, he claimed a January 4, 2016 disabling condition. The start of MetLife's claim adjudication and ultimate rescission determination was based on that date.

[12] The DOH website further disclaims any accuracy of the information provided and "strongly urges all users of this site to conduct their own investigation of any individual." See https://www.floridahealth.gov/disclaimer.html.

information from him on June 7-8, 2019, Dr. Liebowitz failed to respond until October 24, 2019.  So, MetLife's investigation was stalled, in large part, by Dr. Liebowitz himself.

The Court finds that the time MetLife took to rescind Dr. Liebowitz's policy was reasonable.  It is also undisputed that MetLife sent Dr. Liebowitz notice of its rescission on December 30, 2019.  The Court concludes that MetLife has established the fourth element of its rescission claim.

**IV.**

The Court concludes that MetLife carried its burden and has proven all six elements of its rescission claim by a preponderance of the evidence.  MetLife is (and was) entitled to rescind the Policy.  The Court declares that Dr. Liebowitz has no right, title, or interest in the Policy.  This resolves both MetLife's Complaint (Doc. #1) and Dr. Liebowitz's Counterclaim I (Doc. #58, p. 18), which sought reinstatement of the Policy.

Dr. Liebowitz's Counterclaim II seeks a payment of disability benefits under the Policy.  Because the Court determines that Dr. Liebowitz is not entitled to enforce the Policy, Dr. Liebowitz cannot seek relief under the Policy.  Counterclaim II is dismissed with prejudice.

Accordingly, it is now

**ORDERED**:

1. The Court finds that MetLife has sustained its burden of proof as to the Complaint (Doc. #1) seeking recission of the disability insurance Policy.  The Court finds that Dr. Liebowitz has not sustained his burden on his Counterclaim I (Doc. #58) seeking a declaration that the Policy is reinstated.

2. MetLife is entitled to judgment in its favor on the Complaint (Doc. #1), Counterclaim I (Doc. #58), and Dr. Liebowitz's First through Eighth Affirmative Defenses (Doc. #58).

3. Counterclaim II (Doc. #58) is dismissed with prejudice.

4. The Clerk shall enter judgment accordingly and close the case.

**DONE and ORDERED** at Fort Myers, Florida, this _21st_ day of March, 2022.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record

31